**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **25-CR-141-TNM-1** |
| **MARIO BUSTAMANTE LEIVA** | **:** | |

## MEMORANDUM IN AID OF SENTENCING

Mario Bustamante Leiva has, by all accounts, had a very difficult life marked by fear, abuse, and serious addiction.  But he makes no excuses for his actions.  Instead, he recognizes that his past behavior has caused great harm to himself, his family, and the communities in which he has resided.  Having undergone withdrawals and spent the better part of a year in recovery, Mr. Bustamante Leiva is committed to his sobriety and better supporting his family at home in Chile.  Mr. Bustamante Leiva, through undersigned counsel, therefore respectfully requests this Honorable Court sentence him to a period of 6 months each on counts 1–3, and 15 months in custody on count 4, all to run concurrent.  He also requests no fine, restitution, or special assessment be imposed given Mr. Bustamante Leiva's indigent status and the inevitability of his deportation. This requested sentence is sufficient but not greater than necessary under the sentencing factors laid out in 18 U.S.C. §3553(a).

## APPLICABLE LAW

As this Court well knows, the era of binding guidelines ended when the Supreme Court held that after severing the unconstitutional provisions of the Federal Sentencing Reform Act of 1984, "the Guidelines [were made] effectively advisory**.**" *United States v. Booker*, 543 U.S. 220, 245 (2005). Under *Booker,* the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing 18 U.S.C. § 3553(a)(4), (5)).   While  holding  that  district  courts  should  still  consider  the  Guideline

calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as just one among several of the sentencing factors.

In addition, as the Court has explained, "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The sentencing court's "overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

## ARGUMENT

### I.    Mr. Bustamante Leiva's history and characteristics

Mario Bustamante Leiva was born in Santiago, Chile to a young mom in 1975, during a period of significant conflict and struggle. Mario's mother, Bernarda, had her first child—his only full sibling, Juan Carlos—when she was just 14 years old. About two years later, at barely 16, Bernarda had Mario. The family lived in a campamento, a neighborhood consisting of faultily constructed homes—not much larger than 10ft x 10ft per family—with leaky roofs and no floors. In addition, the campamento lacked adequate infrastructure, including electricity and clean water. And because of the unrest and the constant fear of torture and other violence, the family struggled to ever find or maintain a sense of security.

2

 

(examples of campamentos in Chile similar to where Mr. Bustamante Leiva grew up)

This was exacerbated just six months after Mario was born, when the family was abandoned by his father, leaving his mother to resort to begging on the streets of Santiago to provide for her children.  Despite this abandonment, the three were able to draw from a level of support from their extended family, many of whom lived nearby, but who were equally poor.

Bernarda worked hard to raise her children in a loving and supportive home, but Mario and his siblings were forced to grow up incredibly quickly.  About three years after his father left, Bernarda married Mario's stepfather, Roberto, and had two more children.  Roberto regularly abused alcohol, which in turn resulted in the physical, verbal, and emotional abuse of Bernarda, Mario, and Juan Carlos.

In an attempt to help his mom, Mario and his brother left school at just nine and eleven years old and began begging on the streets.  Around this time, Mario also tried alcohol for the first time.  As he recalls it, this was a very difficult time for many in Chile, especially those who, like himself and his family, were among the poorest.  The existence and use of alcohol and drugs was also ubiquitous: every man around Mario, he recalls—uncles, close family friends, even grandparents—had abused the substances with varying effects.  And Mario followed suit.  By about 13 years old, he was smoking and drinking alcohol daily.

3

Like his parents, grandparents, aunts and uncles, Mario never went back to finish school. After spending nearly two decades as a street vendor, Mario moved to Spain. He understood the country to have a relatively large Chilean population, language he didn't need to learn, and much better economy, to find work to support his young son—and eventually his new wife, Marisol, who he met during a trip back to Chile and with whom he now has four children. While in Spain, Mario worked as an undocumented laborer—stocking shelves at grocery stores and learning to cut hair. After some time, and due to his legal status, work became sparse, and Mario resorted to heavily drinking and abusing drugs. His desperation led him to steal which ultimately resulted in his departure.

Upon his return to Chile, Mr. Bustamante Leiva attempted to find work but given the instability in the country, he again searched for another country that would allow him to better support his growing family. That desire led him to the United Kingdom, where a compatriot he met in Spain had settled. London proved significantly more difficult than Spain because not only did he once again did not have a work permit, but he also struggled with the language barrier. After less than five years in London, Mr. Bustamante Leiva's alcohol and drug use had reached new heights, and he picked up multiple theft charges, resulting in his deportation.

When he returned to Chile in 2015, Mr. Bustamante Leiva intended to remain. But another period of political unrest which coincided with the COVID-19 pandemic convinced him that it was time to once again look elsewhere for better wages to support his family. To do so, Mr. Bustamante Leiva flew to the United States where he knew he could find a community of Chileans. Though he did not have legal authorization to work, Mr. Bustamante Leiva was able to quickly find work as a barber and rent a room in a house in Florida, where he stayed for a short period. He later made his way to the New York/New Jersey area, where he knew Chileans who

could help him find more steady work.  During his time in the U.S., Mr. Bustamante Leiva was able to send approximately $500–$1000 a month to his family.  The northeast, however, proved a more difficult place to make enough to survive.  And unfortunately,  Mr. Bustamante Leiva's alcoholism—again in part due to his inability to make enough money to both care for himself and send back home— reached its peak, and he ultimately found himself living on the street.

During this period, Mr. Bustmanate Leiva met his co-defendant, and after a difficult winter on the street, he agreed to join Mr. Montecino-Sanzana to travel back south in search for more work in less hostile weather.  While travelling, Mr. Bustamante Leiva and Mr. Montecino-Sanzana engaged in the offense conduct for which they are being prosecuted.  The pair's offense conduct included Mr. Bustamante Leiva drinking extremely heavily to excess, resulting in him passing out in public on multiple occasions.  On one such occasion his backpack with all of his belongings, including his passport, were stolen.  With no identification, Mr. Bustamante Leiva remained in the D.C. area to attempt to replace his passport, but Mr. Montecino-Sanzana continued to Miami.

Mr. Bustamante Leiva has hit rock bottom, and his alcohol use resulted in his hospitalization at least twice in the first four months of 2025.  The first was in January when he was diagnosed with liver cirrhosis in Baltimore, Maryland.  *See* Ex. 1, Medical Records.  The second was shortly after his arrest in this case.  When he was arrested, Mr. Butamante Leiva was heavily intoxicated, and less than 24-hours later, he was going through very severe withdraws during which he experienced sweats, auditory and visual hallucinations, and delirium.  *See id.*

At his January hospital visit, Mr. Bustamante Leiva refused inpatient alcohol rehabilitative treatment, and his resistance to treatment continued through the time of his arrest in April.  *See id.* But after his longer stay at the hospital post-arrest, Mr. Bustamante Leiva was for the first time forced to seriously confront his addiction, which he has been able to do thanks to programming at

the Correctional Treatment Facility. Mr. Bustamante Leiva accepts full responsibility for his actions. Regardless of how he reached this point, he recognizes the harm he has caused, not just to the victims of his offenses, but to his children, who he is unable to support by virtue of his incarceration. With this outlook, Mr. Bustamante Leiva understands the importance of sobriety, especially given the painful start to his recovery and diagnoses that he understands will cause health problems for him in the future.

Ultimately, Mr. Bustamante Leiva knows his newfound sobriety is a blessing. He beams with pride when he talks about his children and grandchild—aged 30, 23, 18, 16, 5, and 9—who are all finishing or have finished school, stayed away from drugs and alcohol, and are growing and succeeding where he did not.

## II.    Nature and circumstances of the offense

Mr. Bustamante Leiva pleaded guilty to two counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of first-degree theft in violation of 22 D.C. Code § 3212. From the very beginning of this case, Mr. Butamante Leiva sought to accept responsibility and did not wish to entertain anything short of pleading guilty for his actions.

The government frames Mr. Bustamante Leiva as a cold, calculating perpetrator who "repeatedly target[ed] unsuspecting female diners at restaurants" and sought "to extract as much profit as possible before the victims could protect themselves." ECF 64 at 21. But that could not be further from the truth. As the Court can see in his medical records and presentence investigation report, at the time he committed the offenses at issue Mr. Bustamante Leiva was in the throes of addiction, the worst aspects of which appear to be triggered when Mr. Bustamante Leiva is unable to work for an extended period of time. That those who are unable to find work and battle substance use disorders resort to criminal behavior is not controversial. "Job loss or the

6

expectation of a long spell of unemployment can lead some people to abuse drugs and alcohol, commit theft, burglary, robbery or worse. Social scientists from various disciplines have long reported that when unemployment rates rise in a community a host of social problems are exacerbated." James Austin & Gregory Squires, *The "Startling" Link Between Low Interest Rates and Low Crime*, The Crime Report (Dec. 12, 2016) http://www.antoniocasella.eu/nume/Austin-Squires_6dec16.pdf.

Nor is Mr. Bustamante Leiva particularly sophisticated. Instead, all evidence suggests that the thefts in this case were solely crimes of opportunity committed to feed an escalating addiction. This is evidenced by the government's own description of Mr. Bustamante Leiva's surveying and identification of potential victims as lasting just "several seconds." More to the point, when he was arrested, Mr. Bustamante Leiva was very intoxicated and his motel room reportedly had multiple bottles of alcohol. In addition, receipts disclosed in discovery show that alcohol was a, if not the, primary purchase made by Mr. Bustamante Leiva.

The facts of this case, therefore, are more indicative of a man who was fighting an addiction and not of someone who was making sophisticated plans to defraud victims and enrich himself. For these reasons, the Court should impose the requested sentence.

III.    **The purposes of sentencing will be accomplished with the requested sentence**

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 581 U.S. 62, 67 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, this Court must assess "the need for the sentence imposed" "to reflect the seriousness of the offense, promote respect for the law, . . . provide just punishment for the offense," "afford

7

adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)–(C).

Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita*, 551 U.S. at 348, 350. This Court may not presume that a Guideline sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). In 2020, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. *Liberty is the norm; every moment of incarceration should be justified*.

*United States v. Faison*, No. GJH-19-27, 2020 WL 815699, at *1 (D. Md. Feb. 18, 2020) (emphasis added).

8

**A.**    **The requested sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment, as well as provides adequate deterrence to criminal conduct and protects the public.**

Title 18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A lengthy term of incarceration is not required in order for a sentence to reflect the seriousness of the offense. Even a sentence of probation "rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99). Mr. Bustamante Leiva has been in custody since his arrest in April 2025. The requested sentence would reflect the seriousness of the offense, provide just punishment, and promote respect for the law. And a sentence longer than 15 months would not be necessary to deter Mr. Bustamante Leiva or protect the public.

To begin, there is no evidence to suggest that once Mr. Bustamante Leiva is barred from a country, he seeks to return. Mr. Bustamante Leiva entered the United States with valid permission but overstayed his visa. Once Mr. Bustamante Leiva finishes his sentence in criminal custody, he will be immediately transferred to the custody of Immigration and Customs Enforcement then deported. With the entry of final judgment and a final order of removal, he will be barred from the U.S. for a 20-year period. *See* 8 U.S.C. §1182(a)(9)(A)(i) (declaring "inadmissible" any noncitizen who seeks admission "within 20 years . . . at any time in the case of [a noncitizen] convicted of an aggravated felony"); 8 U.S.C. § 1101(a)(43) (defining "a theft offense for which the term of imprisonment [is] at least one year" as an aggravated felony).

9

All indications suggest that Mr. Bustamante Leiva's conduct in this case is related to his alcohol use and addiction. Immediately after his arrest, Mr. Bustamante Leiva went through a period of serious and life-threatening alcohol withdrawal. But he has since become sober. The Court should credit that in his time in custody, Mr. Bustamante Leiva has taken advantage of the vocational and educational opportunities available to him. *See United States v. McMannus*, 496 F.3d 846, 853 (8th Cir. 2007) (Melloy, J. concurring) ("In assessing at least three of the Section 3553(a) factors, deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct."). The moment he was healthy and able Mr. Bustamante Leiva sought out work opportunities at CTF. And despite having very limited reading and writing skills, Mr. Bustamante Leiva has begun to learn English. Mr. Bustamante Leiva has been separated by continents and time zones from his family and because of the cost of incarceration, has had little opportunity to communicate with them. This time apart has been uniquely difficult for Mr. Bustamante Leiva especially given the serious health problems he has faced, and moving forward he has no desire to put his ability to be with his family in jeopardy.

The circumstances of Mr. Bustamante Leiva's conviction and incarceration are very different from those in the past. Now, Mr. Bustamante Leiva is suffering from cirrhosis of the liver and other conditions related to his almost four decades of alcohol abuse. And because one of the victims of his offense is high profile, Mr. Bustamante Leiva has been the subject of media attention both in the United States and at home in Chile, despite not having known who he was stealing from. Moreover, it is an uncontroversial statement that but for one of the victims in this case being a high-profile federal government official—who Mr. Bustamante Leiva had never heard of—Mr. Bustamante Leiva's case would have been prosecuted in D.C. Superior Court because

10

this was a nonviolent offense concerning a relatively nominal amount of money. The undersigned is not raising this point to challenge the government's authority to pursue prosecutions in the tribunal it deems appropriate, but instead, to emphasize that the requirement to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), is not limited to considering defendants convicted of federal crimes, but includes those convicted for similar conduct in local courts including D.C. Superior Court. Indeed, the government's choice to pursue this case in federal court has already increased the seriousness of Mr. Bustamante Leiva's punishment, which further supports a conclusion that the defense-requested sentence will be appropriately just. 18 U.S.C. § 3553(a)(2)(A). Mr. Bustamante Leiva understands that he is responsible for the actions that led him to this position. At the same time, this experience has caused him great distress, shame, and embarrassment such that he is more motivated than ever to change his behavior and remain sober. All of this should be considered in tailoring a sentence for Mr. Bustamante Leiva that is sufficient, but not greater than necessary, to accomplish the Congress-approved goals of sentencing.

**B.    The requested sentence will not create unwarranted sentencing disparities**

The Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform 113 (2004).

11

Mr. Bustamante Leiva qualifies as a Zero-Point Offender under the Sentencing Guidelines Section 4C1.1, which advises that a downward departure, including to a sentence of non-imprisonment, may be appropriate for a person in *any* sentencing zone if they qualify for § 4C1.1 and the guideline range overstates the gravity of the offense. The amended commentary to § 5C1.1, regarding "Imposition of a Term of Imprisonment," provides:

> (B) **Departure for Cases Where the Applicable Guideline Range Overstates the Gravity of the Offense.**—A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. *See* 28 U.S.C. § 994(j).

U.S.S.G. § 5C1.1, Appl. Note 4.

That Mr. Bustamante Leiva's foreign convictions do not score should not be a reason vary upward as the government requests. Congress and the Sentencing Commission made an intentional decision to exclude foreign convictions from counting toward a defendant's criminal history computation. This case is a prime example of why. Members of the defense team have worked with fervor to retrieve the underlying documents related to Mr. Bustamante Leiva's foreign convictions but have come up short.[1] Mr. Bustamante Leiva does not contest that he has multiple foreign convictions but the differences between legal processes and punishment in the U.S. and abroad are vast. As such, and especially without supporting documentation, the Court cannot and should not venture into the complex comparative analysis consideration of Mr. Bustamante Leiva's foreign conviction as a basis for a variance would require.

---

[1] Defense counsel also reached out to both the probation office and the government for any documentation they had to support Mr. Bustamante Leiva's foreign convictions. The only documentation received appears to be related to the 2014 conviction referred to by the government in its sentencing memorandum.

As the Judiciary Sentencing INformation platform shows, in the last five fiscal years, there were 117 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 5 and a Criminal History Category of I. Many of those defendants did not receive any term of imprisonment. Of those who did—77 defendants—the average length of the sentence was one month in custody and the median length was zero months. The sentences of defendants who were convicted of first-degree theft in D.C. Superior Court from 2015–2024 were similar. Of the 182 defendants sentenced, over half—96 defendants—were given either short split or probation sentences, meaning they were required to spend less than six months in custody.[2] And of those who received long split or sentences that were otherwise not suspended—of which there were 86 defendants—another 46 received sentences of 18 months or less. *See* Ex. 2 District of Columbia Sentencing Commission Dataset. Mr. Bustamante Leiva's requested sentence of 6 months on each of the federal counts and 15 months for his D.C. Code count, all to run concurrent, is therefore well within the sentence imposed on other similarly situated defendants.

Moreover, as a noncitizen who will be deported at the conclusion of his sentence because his plea agreement contemplates a stipulated judicial order of removal, Mr. Bustamante Leiva will face significant consequences that go beyond those of citizen defendants convicted of similar offenses. Mr. Bustamante Leiva will not be eligible for earned time credits or related benefits under the First Step Act. *See* 18 U.S.C. § 3632(d)(4)(E) (time credits inapplicable to "deportable prisoners"). The Court should credit the very real reality that Mr. Bustamante Leiva will not be able to engage in specialized programming related to his alcohol use even if the Court were to sentence him to a longer period of incarceration to permit him to engage in such programming. It is uncontested that Mr. Bustamante Leiva has benefited from such treatment since his arrest, and

---

[2] Importantly, the cases reflected in the referenced dataset include defendants across all criminal history scores without apparent ability to filter this category.

such programming and treatment would undoubtedly be beneficial for him moving forward.  But the unfortunate reality is that when noncitizen defendants without legal permission are committed to the Bureau of Prisons, they are not permitted to engage in many of the important and successful rehabilitative programs that citizens or other qualifying noncitizens have access to. *See* Bureau of Prisons, *Directory of National Programs*, https://www.bop.gov/inmates/custody_and_care/docs/ 20170518_BOPNationalProgramCatalog.pdf  (last visited Apr. 15, 2026) (limiting admission to the residential drug abuse program to U.S. citizens); *Gallegos-Hernandez v. United States*, 688 F.3d 190, 195 (5th Cir. 2012) (BOP has authority to preclude noncitizen defendants from substance use programs that have reentry components because such defendants are not eligible for early release related parts of program).

That Mr. Bustamante Leiva will face further consequences due to his immigration status should be considered by this Court in fashioning a sentence in this case.  In *United States v. Smith*, 27 F.3d 649, 650 (1994), the D.C. Circuit held that "a sentencing court may depart below the range indicated by the Sentencing Guidelines where the defendant, solely because he is a deportable alien, faces the prospect of objectively more severe prison conditions than he would otherwise." Though *Smith* was decided before the Supreme Court's decision in *Booker*, subsequent decisions have affirmed the applicability of the principle even when "defense counsel declined to argue in support of th[e] departure because he was bound by the plea agreement not to argue for any departures, but . . .  intended to argue later for a downward variance on those same grounds (a *Smith* variance)."  *United States v. Thomas*, 999 F.3d 723, 733–34 (D.C. Cir. 2021).  Thus, if the Court were inclined, for example, to impose a 24-month sentence in this case but granted a *Smith* variance, the actual sentence imposed should be approximately 18 months.

14

What is more, the conditions inside ICE facilities have grown increasingly worse in 2025 due to overcrowding and the reduced frequency of deportations. *See, e.g.*, Jasmine Garsd, In recorded calls, reports of overcrowding and lack of food at ICE detention centers, June 6, 2025, https://www.npr.org/2025/06/05/nx-s1-5413364/concerns-over-conditions-in-u-s-immigration-detention-were-hearing-the-word-starving (last visited Sept. 25, 2025). And even ignoring a *Smith* variance—which Mr. Bustamante Leiva asserts would be appropriate in this case—noncitizen defendants are known to be held in U.S. Marshal custody well-beyond their release dates. *See* American Immigration Council, Immigration Detention in the United States by Agency, Aug. 20, 2025,    https://www.americanimmigrationcouncil.org/fact-sheet/immigration-detention-united-states-agency/ (last visited Sept. 25, 2025) (noting that even though noncitizen defendants should be transferred to immigration custody immediately upon the conclusion of their criminal sentence, the U.S. Marshal Service has been known to hold defendants in "custody up to six weeks past their release dates").

### CONCLUSION

The time Mr. Bustamante Leiva has spent in custody at the D.C. Jail has impressed on him the gravity of his actions and the resulting consequences.  Mr. Bustamante Leiva is now, perhaps too late given his health prognosis, beginning to understand the severity of his actions and the importance of living a healthy, sober life.  Here, as the Court observed in *Gall*, "[a]ny [further] term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life."  552 U.S. at 44 (citation omitted) (quoting district court).  The requested sentence is not greater than necessary, and is sufficient for the purposes of sentencing.  Mr. Bustamante Leiva, therefore, and for any other reasons set forth at the sentencing hearing, respectfully requests a sentence of 15 months as such a sentence

sufficiently addresses Mr. Bustamante Leiva's conduct as well as other factors pursuant to 18 U.S.C. § 3553(a).

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

    /s/
_____
TEZIRA ABE
Assistant Federal Public Defender
625 Indiana Ave. N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500